OPINION AND ORDER
GARY P. SULLIVAN, Chief Justice.
BRIEF FACTUAL OVERVIEW AND PROCEDURAL HISTORY
Ryan, an enrolled member of the Oglala Sioux Tribe, and Claudia, an enrolled member of the Fort Peck Tribes, were married on May 19, 1994 in Seattle, WA. On June 13, 1994, Claudia gave birth to C.M.A. in Williston, ND[1]. Following C.M.A.’s birth, Ryan and Claudia returned to Seattle with their newborn. In December 1994 Claudia left Seattle for Poplar, MT. Sometime in early 1995, Claudia took up residence in New Mexico and filed a petition for divorce. On May 23, 1995 she was granted a divorce decree and custody of C.M.A. Following the issuance of the decree, Claudia returned to the Fort Peck Indian Reservation with C.M.A. Ryan filed a petition to establish paternity and custody on August 3, 1995 in the Fort Peck Tribal Court. Shortly after Ryan’s petition was filed, Claudia and Ryan signed a joint parenting agreement in the presence of Kimberly Clark, a Clerk of Court for the Fort Peck Tribal Court. Claudia and C.M.A. Ryan’s petition was then dismissed.
Claudia and C.M.A. continued to live in Poplar until late 1996. Ryan joined them sometime during the summer of 1996. The family then moved to New Mexico where they resided outside the exterior boundaries of the Mescalero Reservation during the winter of 1996-1997. In the spring of 1997, Ryan found work in Billings, MT. Claudia and C.M.A. followed him to Billings shortly thereafter.
Sometime in May or June of 1997, Claudia returned to Poplar with C.M.A. where she filed an application for assistance on June 3, 1997[2]. On August 11, 1997, Ryan filed a new petition for ‘ex parte custody order, order to show cause and permanent custody proceedings’. On the same day, *338 the Fort Peck Tribal Court, Chief Judge A.T. Stafne, presiding, issued a temporary custodial order in favor of Ryan, an order requiring Claudia to appear on August 13, 1997 to show cause why the temporary custodial order should not be continued pending further proceedings. On August 13, 1997, Claudia responded by filing a petition for custody, contending that Ryan was not the biological father. The hearing was held on August 13th and the Tribal Court’s order followed on August 14, 1997. Ryan appeared at the hearing with his attorney, however, Claudia was pro se and requested a continuance for the purpose of employing an attorney. The Court granted Claudia’s request, continued the temporary custodial order in favor of Ryan until the scheduled hearing date of August 19th. The Tribal Court also ordered that custody of C.M.A. be given to Ryan at 12:00 noon on August 15th. Claudia promptly employed the services of a Lay Advocate who petitioned this Court for review of the August 14th order. We denied the petition because the issue was not ripe. During the evening of August 14th Claudia took C.M.A. to the Poplar Hospital claiming that Ryan had abused the child while they were living in Billings. She failed to appear for the exchange of physical custody of C.M.A. on the 15th and Ryan sought and received a contempt order against Claudia.
At the August 19th hearing, Claudia, once again appearing pro se, stated that she had given physical custody of C.M.A. to her sister, Sandy Shanta on August 7th and that Sandy was seeking a protective order from the Mescalero Tribal Court in New Mexico. Claudia further claimed that there was a pending investigation regarding Ryan’s alleged sexual abuse of C.M.A. in Yellowstone County on August 7th. Chief Judge Stafne continued ‘indefinitely’ the temporary custodial order in favor of Ryan pending further proceedings to determine the veracity of Claudia’s claims.
Documents from the Mescalero Tribal Court indicate that Charles and Sandra Shanta filed a petition for protective order on behalf of C.M.A. on August 19th, however, the matter was dropped on August 27th and the order was rescinded. Ryan contends that the order was rescinded because the Mescalero Tribal Judge had asked that Sandra bring the child to court and that Sandra could not do so because she did not have physical as Claudia had stated.
On September 30, 1997, Ryan, contending that all of the Court’s questions regarding Claudia’s allegations had been answered, motioned the Court for a final custodial hearing. On the same day, Chief Judge Stafne set the final hearing date for October 22, 1997 and ordered home studies and drug/alcohol evaluations for both Ryan and Claudia.
Notwithstanding her pending petition for custody in the Fort Peck Tribal Court, Claudia filed a petition for custody[3] of C.M.A. in the Mescalero Children’s Court in New Mexico. On October 6th Claudia filed a petition in the Mescalero Tribal Court to modify her divorce degree granted in 1995. She requested that the clause, . one (1) child ... C.M.A., D.O.B. 06-13-94 was born of this marriage” be changed to, “... no children were born to (Claudia) and (Ryan) during this marriage.” Claudia stated that the reason she was doing this was to stop Ryan from trying to take C.M.A. in the Fort Peck Tribal Court. On October 8th the Mes-calero Tribal Court set a hearing date of November 3,1997.
*339 On October 8th the Mescalero Children’s Court issued its order granting ‘guardianship with care, custody, and control’ of C.M.A. to Claudia. Recited in the Court’s findings were: “That Claudia K. Adams stated that she had full and sole custody of (C.M.A.) since birth and living within Mescalero Apache Reservation since 1995 with her sister and brother-in-law (Charles and Sandra Shanta).” The order also stated that Claudia presented a paternity acknowledgement signed by Red Cloud Anquoe, the man she claimed to be C.M.A.’s biological father. The order went on to state that a written statement signed by Red Cloud was submitted to the Court requesting that ‘guardianship’ be awarded to Claudia.
On October 21st Claudia files a motion to dismiss or in the alternative continue the hearing set for October 22nd in the Fort Peck Tribal Court. Claudia based her motion of two issues: 1) the Court lacked personal jurisdiction of her; and 2) paternity needed to be established. Claudia argued that the Fort Peck Tribal Court should stay its hand in favor of the Mescalero Tribal Court where the issue of paternity was pending. Ryan filed his opposition to the motion, stating that overwhelming evidence had already been submitted to the Fort Peck Tribal Court proving that the Court had personal jurisdiction over Claudia and that Ryan was indeed the biological father. Ryan requested that the Court set a hearing date on the jurisdiction question. On October 22, 1997, the Fort Peck Tribal Court requested that both parties brief the issue of personal jurisdiction using the following schedule: October 28th — Claudia’s brief due; November 12th — Ryan’s responsive brief due; and November 26th — Claudia’s final brief due.
On November 17, 1997, a hearing was held in the Mescalero Tribal Court regarding Claudia’s petition to modify the divorce decree of May 23, 1995. The final three (3) paragraphs of that order reads as follows:
“IT IS THEREFORE ADJUDGED AND ORDERED THAT PETITIONER CLAUDIA ADAMS, RESPONDENT RYAN SENSE-WILSON, AND MINOR CHILD (C.M.A.) ARE TO ARRANGE AND GET A BLOOD TEST TO DETERMINE IF RYAN SENSE-WILSON IS THE BIOLOGICAL FATHER OF (C.M.A.). THIS NEEDS TO BE DONE WITHIN 60-CALEN-DAR DAYS. FURTHER “ORDERED” IF NO BLOOD TESTS ARE DONE OR RETURNED TO MESCALERO TRIBAL COURT THIS ORDER WILL AFFIRM COURT ORDER MADE ON MAY 23,1995.
That: a day after this “Order” was issued a Directive from Tribal President was issued to this Court to “concur” with Petitioner’s request.
IT IS THEREFORE “ORDERED” THAT THE CLAUSE IN DISSOLUTION OF MARRIAGE DATED MAY 23, 1995 WHICH STATES: “ONE CHILD (C.M.A.) (DOB 6-13-94) WAS BORN OF THIS MARRIAGE” IS HEREBY “DELETED” FROM THAT ORDER. THIS “ORDER” WILL RESCIND ORDER FOR BLOOD TESTS.”
On February 6, 1998, Ryan filed a “Motion for Ruling on Jurisdiction and Blood Tests” in the Fort Peck Tribal Court, urging the Court to: “(1) rul(e) on motions currently before the court; (2) directing both parties and the minor child (to) submit to blood testing for paternity; and (3) providing sanctions for the failure to cooperate with blood tests.” He also made reference to the Mescalero Tribal Court order of November 17th and alleged that Claudia had obtained this order by using *340 “political interference”. On March 31, 1998, Ryan filed a “Renewed Motion for Ruling” stating that Claudia had failed to file her “final” brief on or before November 26th and cited “Rule 7” of the Rules of Civil Procedure as authority to deem Claudia’s failure to file the brief to be an admission that his motion was well taken.
On April 13, 1998, Ryan filed a “Motion for Ex Parte Custody Order and Order to Show Cause” recounting the history of his relationship with Claudia and C.M.A. citing the fact that no ruling had been forthcoming on his August 11, 1997 petition. He informed the Court that he was now a resident of Riverton, WY. and he alleged that Claudia was living in Ruidoso, NM, which was “outside the Mescalero Indian Reservation”. Notwithstanding the fact that neither he, nor Claudia were residents of Fort Peck, he requested that the Court: “(A) Assert jurisdiction over the minor child and both of her parents; (B) Grant (him) ex parte temporary custody of the parties’ minor child, C.M.A.; (C) Set a time and date directing (Claudia) to appear and show cause why said custody should not be continue pending final resolution of these proceedings; and (D) Award such other and further relief as may be just and appropriate in the circumstances.” Although we found no order in the file, subsequent papers filed by Ryan indicate that the Court granted his request for temporary custody, however, Claudia regained physical custody “on the pretext of exercising visitation” shortly after entry of the order.
On July 24, 1998, both parties appeared for a hearing with their respective counsels. Ryan and Claudia agreed to submit to paternity testing to determine whether Ryan was the biological father. This agreement was approved by the Court and made an order, with the results due before the next scheduled hearing date of August 24, 1998. For reasons not shown in the record, the hearing date was then continued to November 2, 1998.
The hearing was held on November 2nd and the Court filed its order on November 3rd. The findings of the Court included: 1) The Court had jurisdiction over both parties because they both had filed petitions with the Court; 2) That Claudia had failed to submit on three (3) separate occasions for blood testing and that her failure placed her in contempt of court; and 3) That Claudia did not raise any question of paternity prior to her being served with the petition of August, 1997 and that prior to that time she had named Ryan as the child’s father and she had sought child support from Ryan through the Child Support Enforcement Division of the State of Montana. Based in part on these findings the Court ordered permanent custody of C.M.A. to Ryan and that Claudia “shall have no visitation rights with the minor child until such time as she cooperates with the Court’s previous order for paternity testing. Once she has submitted her blood sample to LABCORP, she may file her petition for visitation rights.” (Our emphasis)
Virtually all of the relevant subsequent legal proceedings deal with the Fort Peck Tribal Court order of November 3, 1998 and may be summarized as follows:
[[Image here]]
*341 [[Image here]]
ISSUE PRESENTED
Ryan petitions us to address the following issue:
Whether the Fort Peek Tribal Court has continuing jurisdiction over a custody matter when neither parent nor the child reside within the boundaries of the Fort Peck Indian Reservation?
We believe that the issue for us to decide is:
Whether the Fort Peck Tribal Court has continuing jurisdiction over a custody matter when neither parent nor the child reside within the boundaries of the Fort Peck Indian Reservation, however, the child and the mother are both enrolled members of the Fort Peck Tribes and both parents, on multiple occasions, have invoked the jurisdiction of the Fort Peck Tribal Court when neither parent was residing within the exterior boundaries of the Fort Peck Indian Reservation and most all substantive custodial hearings have been conducted in, and the most current custodial order was issued by, the Fort Peck Tribal Court?
DISCUSSION
We begin by noting that both Claudia and Ryan have attempted to manipulate the judicial system to their own ends and both have engaged in some form of ‘forum shopping’. In their passion and desperation to ‘outdo’ each other, we can only wonder whether either of them has given serious consideration to the best interests of C.M.A. In our analysis of the Fort Peck Tribal Court’s jurisdiction, the welfare and best interests of C.M.A. will be our chief concern.
Ryan argues that the Fort Peck Tribal Court does not have jurisdiction because neither parent, nor the child, were residents of the Fort Peck Indian reservation at the time of Claudia’s petition in December 1999. This is a curious argument inasmuch as Ryan filed an ex-parte Petition for Custody in August 1997 and another ex-parte Petition for Custody in April 1998 in the Fort Peck Tribal Court when neither he, nor Claudia, nor the child were residents of the Fort Peck Indian Reservation. In the April 1998 Petition, Ryan alleged that he was a resident of Riverton, WY and that Claudia was a resident of New Mexico. Nonetheless, It should be noted that Ryan vigorously opposed Claudia’s request for dismissal at that time urging the Fort Peck Tribal Court to: “(A) Assert jurisdiction over the minor child and both of her parents; (B) Grant (him) ex parte temporary custody of the parties’ minor child, C.M.A.; (C) Set a time and date directing (Claudia) to appear and show cause why said custody should not be continued pending final resolution of these proceedings; and (D) Award such other and further relief as may be just and appropriate in the circumstances.” In his brief before this Court, Ryan attempts to *342 reconcile his request for dismissal with his previous invocations of Fort Peck Tribal Court jurisdiction by suggesting that the difference between his actions now, and those of late 1997, lies in the ‘fact’ that both mother and child were residents of Poplar, MT., and both parents filed petitions with this court. Supporting his argument that jurisdiction does not lie with the Fort Peck Courts, Ryan cites 28 U.S.C. 1738A(d) as the controlling authority.
We reject Ryan’s argument for two reasons. First, the facts do not support his statement that ‘both mother and child were residents of Poplar’ at the time of the 1997 petition. In the proceedings of 1997, Ryan argued that Claudia was a resident of Poplar, however, Claudia disputed that argument, claiming to be a resident of New Mexico. Secondly, 28 U.S.C. 1738A(d) is not the controlling authority. Although 1738B (Full Faith and Credit for Child Support) expressly includes ‘Indian Country’[4], 28 U.S.C. 1738A[5] (Full Faith and Credit for Child Custody) does not.
During oral argument in this Court, we posed the question as to whether 28 U.S.C. 1738A was the controlling authority and we invited briefing by counsels on the issue. Ryan submitted his “Additional Points of Authority” citing In re: A.W.E. FPCOA# 338 (2000), reminding us that in A.W.E., we held that the Tribal Court had jurisdiction pursuant to 28 U.S.C. 1738A. Additionally, Ryan states that in another case we applied 28 U.S.C. 1738A in deciding that the State of Idaho did not have continuing jurisdiction of a custody matter. In re: M.W. FPCOA# 242 (2000). Upon citing these two cases, Ryan asks: “Can (the Fort Peck Court of Appeals) pick and choose when it will apply 28 U.S.C 1738A ... ?” Title VIII CCOJ 2000 § 501(d) of the Fort Peck Comprehensive Code of Justice provides us with some guidance regarding the answer to that question:
“See. 501. Applicable laws -(d) where appropriate, the Court may in its discretion be guided by statutes, common law or rules of decision of the State in which the transaction or occurrence giving rise to the cause of action took place.” (Our emphasis)
We explained the application of § 501(d) in Clark v. Richter, FPCOA# 300 (2000):
“... We cannot, in good conscience, expand Chief Judge Stafne’s order. He stated that he was adopting 27-6-101 (Montana Legal Medical Malpractice Act) in the particular action before him. He did not, in any way, imply that his order would go out into the land as an edict for all others who would come before the Tribal Court alleging medical malpractice. However, we can certainly understand defendant’s implied argument that, “if it’s good in one case it should prove good in all others”. We can also understand how defendant could fortify this implied argument with the favorable language that this Court used regarding 27-6-101 in FPCOA# 200.
“When our Court affirmed Ferguson, the primary issue was our interpretation of our CCOJ Title IV § 501(d). (s omitted) Specifically, the appellant in Ferguson challenged the Tribal Court’s authority to adopt Montana law, sug *343 gesting that to do so, would be a usurpation of power vested only in the Tribal Executive Board. At no time in our opinion in Ferguson did we endorse the notion that 27-6-101 be applied to all incoming medical malpractice cases. Nor do we do so now. Rather, we held in Ferguson, and we re-affirm now, that the Tribal Court has discretion to adopt 27-6-101 on a case by case basis. If defendant feels that the interests of justice would be better served by applying 27-6-101 to the case before us, the proper procedure would be to motion the Tribal Court for that purpose.” (Our emphasis)
It is our belief that when the U.S. Congress enacted 1738A it deliberately omitted Indian Country because of the special relationship and interest that Native American Tribes have with their children (See The Indian Child Welfare Act-25 U.S.C.1911). On the other hand, Indian Country was expressly included in 1738B to insure that all children could be assured that enforcement of the support due to them would be uniform within the exterior boundaries of the United States and its possessions.
We believe that § 501(d) gives our Courts discretion to apply laws, rules and decisions that are not otherwise controlling on a ‘ease-by-case’ basis. We believe that it would not be prudent for us to restrict our Tribal Court to federal and state statutes and laws that are not otherwise binding. Indeed, § 501(d) provides for ‘guidance’ only, it does not allow for adopting laws that are not otherwise controlling. Thus, to the extent that either FPCOA# 242 or FPCOA#338 states or suggests that 28 U.S.C. 1738A is controlling, thus binding our Tribal Courts, they are expressly overruled.
Ryan also argues that Title II CCOJ 2000 § 107[6] prohibits the Tribal Court’s jurisdiction in this case. We disagree. We believe § 107(a) provides for jurisdiction in this matter. Nonetheless, if this matter were to come before our Tribal Court without any previous contact between the litigants and the Tribal Court, we would be more inclined to agree with Ryan. However, it is precisely due to the previous contacts between these litigants and the Fort Peck Tribal Court that compels us to affirm the Tribal Court’s denial of Ryan’s Motion for Dismissal. The Court considers the following facts and factors:
1. Both Claudia and C.M.A. are enrolled members of the Fort Peck Tribes.
2. Both Ryan and Claudia have invoked the jurisdiction of the Fort Peck Tribes on multiple occasions in the past and each has vigorously fought to keep jurisdiction within the Fort Peck Tribal Court when it suited them own purpose.
3. No other Court of competent jurisdiction has conducted a full custodial hearing except for the Fort Peck Tribal Court.
4. No other Court has intervened in this matter seeking to modify the Fort Peck Tribal Court order of November 3, 1998.
5. We take judicial notice of the distance between Ryan (Seattle) and Fort Peck (1050 miles) and Claudia (Mescale-ro, NM) and Fort Peek (1322 miles) and *344 the distance between Ryan and Claudia (1600 miles). We conclude that Fort Peck is the most convenient forum geographically for both of them. Indeed, Claudia is required to travel a greater distance.
Further supporting jurisdiction in the Fort Peck Tribal Court, we note that in the court order giving Ryan permanent custody, the Fort Peck Tribal Judge denied even visitation rights to Claudia until she complied fully with the Court’s previous orders. The Court went on to leave the judicial door open to Claudia by stating: “Claudia Adams shall have no visitation rights with the minor child until such time as she co-operates with the Court’s previous order for paternity testing. Once she has submitted her blood samples to Lab Corp she may file her petition for visitation rights.” (Our emphasis) It could prove prejudicial to Claudia to compel her to vindicate herself in a Court that is not intimately familiar with the facts and background as to why our Tribal Court made this order.
We believe that the ends of justice for each of the parties would be better served, as well as C.M.A.’s best interests, to have her custodial future heard in the Fort Peck Tribal Court. Accordingly,
IT IS NOW THEREFOR THE ORDER OF THIS COURT THAT:
The Tribal Court order of January 19, 2000, denying appellant’s Motion to Dismiss is affirmed and shall be complied with fully. The Tribal Court is instructed to place this matter on its calendar at the earliest possible date.
CONCUR: GERARD M. SCHUSTER, Associate Justice, CARROLL J. DeCOTEAU, Associate Justice.

. Portions of our factual background are taken from Ryan’s unopposed brief.

. Ryan contends that Claudia and C.M.A. were living with him in Billings, MT. at this time and that Claudia’s application for benefits was fraudulent.

. The date that Claudia filed her petition could not be determined from the record. The order resulting from her petition was dated October 8, 1997.

. 28 USC 1738B (b) Definitions. — In this section: "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the territories and possessions of the United States, and Indian country (as defined in section 1151 of title 18). (our emphasis)

. 28 USC 1738A (b) As used in this section, the term — (8) “State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States;

. Sec. 107. Civil jurisdiction of the Court.
The Court shall have jurisdiction over any action where one party to the action shall be an Indian, or a corporation or entity owned in whole or in substantial part by an Indian or the Tribes or a corporation or entity chartered by the Tribes; and
(a) the cause of action arises under the Constitution or laws of the Tribes; or
(b) an Indian party to the action resides on the Fort Peck Reservation.